*Super.* 496, 506, 499 *A.*2d 515 (App.Div.1985); *also State v. Roth,* 95 *N.J.* 334, 360, 471 *A.*2d 370 (1984).[3]

The need to remand the matter for resentencing makes moot defendant's remaining contention that the sentences imposed were excessive.

The convictions are affirmed. Count 1 is merged into count 2. The matter is remanded for resentencing on count 2 as a second-degree offense and correction of the judgment of conviction.

588 A.2d 879

AMPRO FISHERIES, INC., APPELLANT, v. JUDITH YASKIN, COMMISSIONER OF ENVIRONMENTAL PROTECTION; GEORGE HOWARD, DIRECTOR, DIVISION OF FISH, GAME & WILDLIFE; AND BRUCE FREEMAN, ADMINISTRATOR, MARINE FISHERIES ADMINISTRATION, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 26, 1991—Decided April 3, 1991.

---

[3]We need not consider defendant's argument as to whether the cross-appeal was timely filed because we have the power to correct the illegal sentence *sua sponte. See State v. Paladino,* 203 *N.J.Super.* 537, 549, 497 *A.*2d 562 (App.Div. 1985).

Before Judges PRESSLER, DEIGHAN and BAIME.

*Edward V. Cattell, Jr.* argued the cause for appellant (*Clark, Ladner, Fortenbaugh & Young,* attorneys; *Edward V. Cattell* and *Douglas K. Walker* on the brief; *Edward V. Cattell* on the reply brief).

*Rachel Horowitz,* Deputy Attorney General, argued the cause for respondents (*Robert J. Del Tufo,* Attorney General, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel; *Rachel Horowitz* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D. .

This appeal challenges the July 1989 action of the Division of Fish, Game and Wildlife, Department of Environmental Protection, in amending *N.J.A.C.* 7:25–22.1 and –22.2 and adopting 7:25–22.3 and –22.4, the regulations governing Atlantic menhaden fishing in New Jersey's territorial waters. More particularly, Ampro Fisheries, Inc., a foreign corporation whose principal place of business is in Virginia, attacks the validity of those provisions of the regulations which prohibit purse seine fishing for menhaden for purposes other than for bait in the Delaware, Raritan and Sandy Hook Bays and within 1.2 nautical miles of shore. *N.J.A.C.* 7:25–22.2(a)(2). The regulations bar purse seine fishing of menhaden for bait within .6 nautical miles of shore and permit limited incursion for bait fishing into the bays. *N.J.A.C.* 7:25–23.3.

Ampro, whose purse seine menhaden fishing. operation is affected by the 1.2 mile limit and bay preclusion, contends that the regulations, insofar as they affect the waters of Delaware Bay, are invalid because they contravene the Compact of 1905 by which New Jersey and Delaware agreed to joint regulation of fishing in that body of water. *See N.J.S.A.* 52:28–34, *et seq.; Del.Code Ann.* tit. 23; 34 *U.S.* Stat. 858 (1907). Ampro also argues that the restrictions violate the interstate commerce, privileges and immunities, and supremacy clauses of the United States Constitution and that they are *ultra vires* and constitute an invalid use of the police power.

We agree with Ampro that the 1905 Compact precludes the power of this state unilaterally to regulate fishing in Delaware Bay. The regulations must consequently be modified in that

respect. We reject, however, as without merit, its remaining challenges to the regulations.

Our consideration of the regulations requires a brief contextual reference. Atlantic menhaden are a plentiful Atlantic Ocean fish which migrate in schools from North Carolina to Maine. Although they are neither a sport nor a food fish, they are pursued by commercial fishing operators for two primary purposes: bait and reduction. The reduction process produces fish oil and fish meal, which have significant commercial applications. Typically, vessels engaged in obtaining menhaden for reduction purposes are 165 to 220 feet long, weigh approximately 190 tons, and use purse seines which are 1200 feet long by 90 feet deep. They rely on spotter aircraft to locate schools, which are frequently but not exclusively, within 1.2 nautical miles of shore. Historically, New Jersey has issued about 16 menhaden reduction licenses annually. See N.J.S.A. 23:3–51 and –52. There has been no New Jersey-based company taking menhaden for reduction since the early 1980's. Menhaden fishing for bait is undertaken by much smaller vessels, typically less than 90 feet, which use much smaller nets.

According to the record, there is a long history of social and spacial tensions in the near-coastal Atlantic waters between recreational sport fishing boats and commercial menhaden vessels, which have led to the adoption by most Atlantic coastal states of some sort of commercial-fishing restrictions. New Jersey's first regulation of menhaden fishing was responsive to a serious conflict between 16 menhaden vessels and a group of recreational boaters in 1983. The regulation adopted the following year, N.J.A.C. 7:25–22.1 and –22.2, made no distinction between reduction and bait fishing, barring all purse seine menhaden fishing within .6 nautical miles of shore and on weekends and holidays. Consideration of the regulatory issue continued, however, and in 1987 the New Jersey Marine Fisheries Council which advises DEP, see N.J.S.A. 23:2B–1, et seq., particularly 23:2B–4, appointed a menhaden subcommittee. It

was this subcommittee which conceived of the scheme of separately regulating the bait and reduction operations.

Following considerable debate and discussion involving representatives of all affected groups, public and private, the present regulations were proposed, a public hearing held, and the regulations adopted. DEP's comments accompanying both its proposal and adoption, 21 *N.J.R.* 107 (1989) and 21 *N.J.R.* 2035 (1989), respectively, indicate that while the regulations would have a negative impact on the menhaden reduction industry, the same quantity of fish could be caught with additional fishing time. On the other hand, the DEP was of the view that the regulations would have the positive effect of removing "large-scale vessels operating large nets from an already crowded near-shore fishing area" and reducing "spacial conflicts with coastal navigation." 21 *N.J.R.* 107. DEP also concluded that the regulations, in their totality, including their clean-up provisions, would benefit coastal communities, would provide additional protection for the menhaden stock, especially juvenile menhaden, and would enable predatory fish and birds to feed more easily within the protected zone. Finally DEP anticipated economic benefit for other industries, including commercial crabbers and lobstermen and suppliers of recreational fishing equipment and bait.

 Leaving aside for the moment the Delaware Bay problem, we are satisfied that the regulations are otherwise valid and that Ampro has failed in its heavy burden of overcoming the presumptive validity and reasonableness which attends administrative regulation. *See e.g., Bergen Pines Hosp. v. Department of Human Serv.,* 96 *N.J.* 456, 477, 476 *A.*2d 784 (1984). Clearly, the regulations are well within the scope of the enabling statutes and consistent with its legislative purpose and policy. *See N.J.S.A.* 23:2B–1 and particularly *N.J.S.A.* 23:2B–2 and –6. The *ultra vires* argument is therefore meritless. Moreover, the disparate treatment of bait and reduction enterprises is based upon rational classification supported by the

record as is the extent of the restrictions. Moreover, the record supports the reasonableness of the restriction imposed in terms of the problem to be addressed, the extent of the legislative power to address it, and the need to accommodate the panoply of competing interests. We therefore reject Ampro's "police power" argument as well.

■ With respect to Ampro's privileges and immunities claim, we note first that as a corporate litigant, that argument is not available to it. Corporations have been consistently held to be excluded from the protections of Art. IV, section 2, clause 1 of the United States Constitution. *See, e.g., Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 *U.S.* 648, 656, 101 *S.Ct.* 2070, 2076, 68 *L.Ed.*2d 514, 522–523 (1981). Beyond that, the regulations are, on their face, resident-neutral. Any New Jersey resident choosing to enter the menhaden reduction business will be subject to the same restrictions as now apply to the present out-of-state fleet.

■ Nor do we find merit in the commerce clause argument Ampro advances under Article I, section 8, clause 3 of the United States Constitution. We note that this court has recently considered the effect of that clause on the validity of administrative regulations in *In the Matter of Allegations of Violations By Recycling & Salvage Corporation,* 246 *N.J.Super.* 79, 586 *A.*2d 1300 (App.Div.1991) (approved for publication February 21, 1991). We need not retread the ground so carefully covered by Judge Michels. It suffices to repeat the principle that "a legitimate nondiscriminatory exercise of police power is not barred by the commerce clause because it might indirectly affect interstate commerce." (slip opinion at 16–17). This is particularly so where the weight and nature of the state's regulatory concerns outweigh the incidental effect of its regulatory scheme on interstate commerce. *See Matter of Fiorillo Bros. of N.J., Inc.,* 242 *N.J.Super.* 667, 679, 577 *A.*2d 1316 (App.Div.1990). We are convinced that the regulations here constitute a legitimate, nondiscriminatory exercise of police

power substantially advancing a legitimate state interest which, particularly in view of the complex of other coastal states' restrictions, affects interstate commerce only indirectly and incidentally.

■ Ampro's supremacy argument under Art. VI, clause 2, is based on federal navigational laws and federal enrollment and licensing laws which, it claims, preempt state regulation of the activities of federal licensees in coastal waters. While a total prohibition of menhaden fishing in state waters might well run afoul of Ampro's federally licensed rights, *see Douglas v. Seacoast Products, Inc.*, 431 *U.S.* 265, 97 *S.Ct.* 1740, 52 *L.Ed.*2d 304 (1977), the regulations here are not prohibitory but only regulatory, constituting a reasonable and nondiscriminatory conservation and environmental protection scheme not substantially inconsistent with Ampro's federally-accorded rights.

■ We turn now to the Delaware Bay issue. DEP attempts to justify New Jersey's unilateral action in excluding menhaden reduction fishing in that body of water by arguing that the 1905 Compact has been mutually abandoned by reason of the fact that the two states have never enacted complementary fishing laws. We must reject that argument. The Compact, as we have noted, was enacted by both states and approved by an act of Congress. Not only is it not subject to unilateral abrogation by either state but it is also clear that a state court lacks "the power to abrogate or modify interstate compacts approved by Congress." *Guarini v. State of New York*, 215 *N.J.Super.* 426, 432, 521 *A.*2d 1362 (Ch.Div.), *aff'd o.b.* 215 *N.J.Super.* 293, 294, 521 *A.*2d 1294 (App.Div.1986), *cert. denied* 484 *U.S.* 817, 108 *S.Ct.* 71, 98 *L.Ed.*2d 34 (1987). It is hence not within the competence of the judiciary of one of the Compact states to rule that the Compact no longer exists by reason of abandonment. That is a matter for legislative action. It is, however, clear that the Delaware Bay provision of the regulation is entirely severable and that its illegality does not taint the validity of the remaining regulatory scheme.

Insofar as *N.J.A.C.* 7:25–22.1 to –22.4 affects menhaden fishing in the Delaware Bay, the regulation is invalid. In all other respects the regulation is valid and enforceable.