606 A.2d 1099

AMPRO FISHERIES, INC., RESPONDENT AND CROSS–APPELLANT, v. JUDITH YASKIN, COMMISSIONER OF ENVIRONMENTAL PROTECTION; GEORGE HOWARD, DIRECTOR, DIVISION OF FISH, GAME AND WILDLIFE; AND BRUCE FREEMAN, ADMINISTRATOR, MARINE FISHERIES ADMINISTRATION, APPELLANTS AND CROSS–RESPONDENTS.

Argued February 3, 1992—Decided June 4, 1992.

*Rachel Horowitz,* Deputy Attorney General, argued the cause for appellants and cross-respondents (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Deputy Attorney General, of counsel).

*Edward V. Cattell, Jr.*, argued the cause for respondent and cross-appellant (*Clark, Ladner, Fortenbaugh & Young*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This appeal primarily concerns two issues of federal law: (1) whether the interstate Compact of 1905 between New Jersey and Delaware prohibits New Jersey from unilaterally regulating the fishing of menhaden in the territorial waters of New Jersey in the Delaware Bay, and (2) whether, in any of the territorial waters of the state, the regulations at issue constitute an impermissible burden on interstate commerce.

I

A.

For the purpose of providing a brief history of the menhaden-fishing industry in New Jersey, we draw upon the briefs and appendices of the parties as well as other documentation filed by the Department of Environmental Protection and Energy (DEPE) in legislative hearings.[1]

Since colonial times, the menhaden has engaged the attention of both courts and regulators along the Atlantic coast. In 1889, Massachusetts authorities arrested coastal fishermen who were fishing for menhaden with seine nets in Buzzards Bay. The menhaden fishermen argued that the waters of Buzzards Bay were the waters of the United States and therefore only the United States could regulate seining of menhaden. Massachusetts disagreed and found the fishermen guilty. On appeal, the United States Supreme Court agreed with the Common-

---

[1]Much of the information has been drawn from the appendix to *Prohibits The Taking of Menhaden: Hearings on S. 1372 Before the Senate Natural Resources and Agricultural Comm.*, 201st Leg., 1st Sess. (1984).

wealth, holding that if Congress "does not assert by affirmative legislation its right or will to assume the control of menhaden fisheries in such bays, the right to control such fisheries must remain with the State which contains such bays." *Manchester v. Massachusetts*, 139 *U.S.* 240, 266, 11 *S.Ct.* 559, 565, 35 *L.Ed.* 159, 167 (1891).

In 1906 and 1909, the Annual Reports of the New Jersey Fish and Game Commission contained complaints, unsubstantiated at that time, that menhaden boats operating too close to shore were interfering with blue fishing. *See Regulates the Taking of Menhaden: Hearings on A. 3430 Before the Assembly Conservation and Natural Resources Comm.*, 204th Leg., 1st Sess. at app. 77 (1990) [hereinafter *Hearings* ].

In 1977, a New Jersey-based menhaden-fleet operator had to invoke the Supremacy Clause to gain access to Virginia's territorial waters. *See Douglas v. Seacoast Prods.*, 431 *U.S.* 265, 97 *S.Ct.* 1740, 52 *L.Ed.*2d 304 (1977).

Despite its commercial value, most New Jerseyans have undervalued the menhaden. To them it is "moss bunker" or "bunker," an inedible and sometimes unwelcome visitor to our rivers and estuaries. In New Jersey, a recreational fisherman expressed his changing perception of this fish:

> As a boy on the beach, I had a strong disdain for the bunker fleet. To me they were responsible for poor fishing, for the destruction of bluefish, stripers and weaks and for depletion of the prey upon which the sportfish existed. I held this belief for many years until I began to hear arguments on the other side. These arguments from my opponents were supported by facts and figures while I was totally unable to come up with any proof to justify my stand. Believe me, I did research on the subject but found nothing. I was forced to concede that what I had believed all along was based largely on the psychological effect caused by seeing the bunker boats fishing close to shore and nothing more. [*Hearings, supra,* at app. 34.]

This case tests the "facts and figures" adduced to justify the State's regulation of the menhaden fleets.

## B.

Plaintiff, Ampro Fisheries, Inc. (Ampro), is a commercial fishing company with its principal place of business in Virginia.

Ampro operates sixteen fishing vessels. All of those vessels are federally licensed to fish for menhaden, and nine are also licensed by the State of New Jersey for the taking of menhaden. Each of those vessels is from 155 to 187 feet in length. The company owns processing plants in Virginia, North Carolina, and on the Gulf of Mexico.

Menhaden or "moss bunkers" are a member of the herring family and are found along the Atlantic and Gulf Coasts of the United States. They spawn in the ocean in every month of the year in some part of their range. The young make their way into estuaries where they grow rapidly. In the fall, they move south and off-shore, and are seldom seen during the winter months.

The menhaden fishery forms the basis for the United States' largest commercial fishery in terms of pounds landed. In 1983, forty-six percent of the commercial-fishery catch in the United States consisted of menhaden and was valued at $36.9 million. Currently, the catch is not used for human food. Although Native American Indians used the menhaden to fertilize their corn and other crops, it is now too valuable for that use. A small quantity is used for bait, but most of the catch is reduced to fish meal, oil, and a liquid by-product. The meal and by-product are used as a protein supplement in livestock feed, while the oil is used in the manufacturing of various products, including paint, linoleum, cosmetics, and margarine.

By far the largest part of the harvest is taken by purse seines. In purse seining a large vessel of 70 to 200 feet generally carries two purse boats, each about thirty-six feet in length. The net employed is approximately 1,000 to 1,400 feet long. Aircraft that accompany the vessels spot menhaden schools. When a good-sized school is located, the purse boats are lowered into the water. One-half of the purse seine is loaded into each of the two boats and they proceed, side by side, laying out the net toward the school. As they near the school, they move apart and begin laying out the net. They lay the net

around the school from opposite sides until they meet. When the two ends are joined and the school is surrounded, the bottom of the net is closed or "pursed." At that point, the purse boats begin to haul in the nets. The large vessel then joins the purse boats, and the three vessels form a triangle with the net between them. After a large hose has been lowered into the net, the fish are pumped aboard the large vessel. During that process, marine-fisheries regulators can determine the extent to which the purse-seine operation harvests other fish.

Because of the menhaden's great importance, with the aid of state and federal fisheries scientists, the Atlantic States Marine Fisheries Commission, an organization created to improve the use of our Atlantic coast fisheries resources, has developed a plan to achieve the greatest continuing yield for each area by determining the age at which menhaden should be harvested and eliminating other restrictions which do not contribute to the management goal.

## C.

At issue in this case is the effect of off-shore regulations on the harvest of menhaden. Ampro contends that the vast majority of menhaden is within 1.2 miles of the shoreline. Furthermore, plaintiff argues that for many years protectionist interests favoring Seacoast Products, Inc. (Seacoast or Seacoast Products), then based in Belford on Sandy Hook Bay, permitted menhaden fishing for industrial-production purposes without restriction in the Atlantic Ocean and Delaware, Raritan, and Sandy Hook Bays. After the Seacoast plant ceased operation in 1982, New Jersey restricted the harvest of menhaden in New Jersey waters by regulations adopted in 1983. Those regulations provided that menhaden fishermen could fish for menhaden using purse seines not closer than 0.6 nautical miles from the New Jersey coastline and in the Delaware, Raritan, and Sandy Hook Bays.

On July 17, 1989, the DEPE adopted the regulations at issue here. Those regulations prohibit purse-seine fishing of menhaden for other than bait purposes closer than 1.2 nautical miles from the Atlantic coastline. *N.J.A.C.* 7:25–22.2(a)2. Fishing for menhaden for industrial-production purposes in the Delaware, Raritan, and Sandy Hook Bays, which was previously permitted, is now prohibited by the regulations. At the same time, the DEPE adopted regulations that restrict purse-seine bait-fishing of menhaden to vessels ninety feet in length or less and not closer than 0.6 nautical miles from the shoreline in the Atlantic Ocean and Delaware Bay. Those regulations further prohibit that type of fishing closer than 0.3 nautical miles from the shoreline in the Raritan and Sandy Hook Bays. *N.J.A.C.* 7:25–22.3(b)2 and 3.

In February 1990, Ampro attacked the regulations, arguing that they violated the Commerce, Privileges and Immunities, and Supremacy Clauses of the federal Constitution; were not reasonably related to the public health and safety; and were *ultra vires.* In addition, Ampro argued that the 1905 Compact between New Jersey and Delaware made the regulations invalid as they applied to the Delaware Bay.

The Appellate Division upheld the general validity of the regulations, 247 *N.J.Super.* 111, 588 *A.*2d 879 finding that they did not violate any constitutional provision and were not preempted by federal law. However, the Appellate Division held that the regulations were invalid as applied to the Delaware Bay because the 1905 Compact precluded "the power of this state unilaterally to regulate fishing in Delaware Bay." 247 *N.J.Super.* at 114, 588 *A.*2d 879.

We granted both parties' petition for certification. 126 *N.J.* 340, 598 *A.*2d 896 (1991). We now reverse so much of the Appellate Division's judgment as concerns the 1905 Compact between Delaware and New Jersey.

## II

### *The Compact Issue.*

#### A.

The 1905 Compact between Delaware and New Jersey, codified at *N.J.S.A.* 52:28–34 to –46, was created with the approval of Congress. 34 *Stat.* 858 (1907). The purpose of the Compact was to resolve a long-standing boundary dispute between the states regarding a twelve-mile arc around the Town of New Castle on the Delaware River. The Compact was also designed to resolve a twenty-seven-year-old law suit that was pending before the United States Supreme Court involving Delaware fishing regulations. *N.J.S.A.* 52:28–34. The dispute began in 1872 with Delaware authorities arresting twenty-two New Jersey fishermen on the Delaware River for fishing without a Delaware license. The fees demanded of New Jersey fishermen were greater than those charged to citizens of Delaware. *The State of the Question of Jurisdiction and Boundary Between New Jersey and Delaware,* A.D.1873 (1873) (on file in the State Library).

The Compact provided that the inhabitants of each state should enjoy a common right of fishery in the waters of the Delaware River between the low-water marks on each side of the river with the exception of previously-granted private rights of fisheries, *N.J.S.A.* 52:28–37, and established a joint commission to draft laws to "regulate the catching and taking of fish in the Delaware river and bay between said two states." *N.J.S.A.* 52:28–38.

The Appellate Division concluded that the Compact preempted any unilateral action by the State of New Jersey. We disagree. By its terms, the Compact pledged the member states to adopt uniform regulations only if the commissioners from each of the states recommended uniform regulations to them. Specifically, the Compact states only "[u]pon the adoption and passage of said laws so recommended by the respec-

tive legislatures of said two states, said laws shall constitute the sole laws for the regulation of the taking and catching of fish in the said river and bay between said states." *N.J.S.A.* 52:28–38. Although the commissioners recommended, and the states have adopted, certain fishing regulations, they did not recommend purse-seine regulations with respect to menhaden.

### B.

■ ⸲ We have recently reviewed the law concerning such an interstate compact. *Eastern Paralyzed Veterans Ass'n v. City of Camden,* 111 *N.J.* 389, 545 *A.*2d 127 (1988). Those compacts are not the product of a single state, but rather of both states. Thus, "[i]t follows that neither creator state can unilaterally impose additional duties, powers or responsibilities" that infringe on the compact. *Nardi v. Delaware River Port Auth.,* 88 *Pa.Cmwlth.* 558, 490 *A.*2d 949, 950 (1985) (citing *C.T. Hellmuth & Assocs., Inc. v. Washington Metro. Area Transit Auth.,* 414 *F.Supp.* 408 (D.Md.1976); *Bell v. Bell,* 83 *N.J.* 417, 416 *A.*2d 829 (1980)). Only when the compact recognizes the unilateral jurisdiction of the compact states may the compact's agenda be subject to single-state jurisdiction. *Eastern Paralyzed Veterans Ass'n, supra,* 111 *N.J.* at 399, 545 *A.*2d 127.

■ On the other hand, courts have regularly held that a bi-state agency may be subject to complementary or parallel state legislation that does not intrude on the mission of the agency. *Id.* at 400, 545 *A.*2d 127. The simplest example is that bi-state agency employees must observe stop lights in New Jersey just as they would be required to in Pennsylvania, even though neither state had adopted such regulations within the framework of the compact. *Ibid.* (citing *Nardi v. Delaware River Port Auth., supra,* 490 *A.*2d at 952 n. 10).

### C.

With that background, we first note that there is, in the words of the Attorney General, a "condition-precedent" to any

claim of exclusive jurisdiction under the Compact, namely, that the commissioners of both states first must have agreed to recommend a joint regulation of a particular species of fish that would constitute the "sole laws" contemplated by the Compact. *N.J.S.A.* 52:28–38. The joint commission did propose and New Jersey did enact such laws with respect to certain species and fishing practices, *L.*1907, *c.* 131, but Delaware did not. *See N.J.S.A.* 52:28–38 Historical Note. Absent such a concurrence, each state presumably would retain the right, at least within its territorial waters, to regulate the taking and catching of fish in the river. *N.J.S.A.* 52:28–38. *See Nicoulin v. O'Brien*, 248 *U.S.* 113, 39 *S.Ct.* 23, 63 *L.Ed.* 155 (1918) (Kentucky was not prohibited from legislating to protect the fish within its boundaries simply because it had entered into a compact with Indiana that provided for concurrent jurisdiction); *State v. Mick*, No. 83–05–0092–93 (Del.Super.Ct. May 2, 1984) (1905 Compact did not require passage of uniform laws unless recommended by commissioners). We also note that the decree of entitlement to the river bed within the twelve-mile arc around Newcastle entered by the Supreme Court in 1935, *New Jersey v. Delaware*, 295 *U.S.* 694, 55 *S.Ct.* 907, 79 *L.Ed.* 1659 (1935), has no disabling effect on New Jersey's regulation of the eastern-shore waters of the Delaware. Absent any restraints created by the Compact, New Jersey exercises its sovereign powers fully in those waters. *See State v. Federanko*, 26 *N.J.* 119, 127–29, 139 *A.*2d 30 (1958) (gambling offense on New Jersey side of Delaware River found amenable to our criminal jurisdiction although the United States Supreme Court found State of Delaware owned the river bed).

In addition, we take note of the fact that the purse-seine regulations do not directly conflict with any regulations enacted by the State of Delaware. *See Del.Code Ann.* tit. 7, § 919(b) (1991). They appear in that sense to be complementary or parallel. Because New Jersey's position with respect to purse seining is in no way inconsistent with that of Delaware, there is, as the Attorney General puts it, no current dispute between

Delaware and New Jersey, but simply a dispute between New Jersey and Ampro.

## III

### *The Commerce Clause Issue.*

#### A.

■ There can be no doubt, however, that plaintiff's fishing rights are protected by the Commerce Clause. The states do not have full-fledged property interests in the wildlife within their boundaries. *See Missouri v. Holland,* 252 *U.S.* 416, 40 *S.Ct.* 382, 64 *L.Ed.* 641 (1920) (treaty may override state's authority to regulate migratory birds). Even when legislating in areas of legitimate local concerns, such as environmental protection and resource conservation, states are nonetheless limited by the Commerce Clause. *See Lewis v. BT Inv. Managers, Inc.,* 447 *U.S.* 27, 100 *S.Ct.* 2009, 64 *L.Ed.*2d 702 (1980) (Florida statute providing that out-of-state banks could not own businesses within the state furnishing investment advisory services violated the Commerce Clause).

Courts have long recognized the opportunity to fish as an interest of sufficient importance to warrant constitutional protection and in some cases have struck down laws that were found to be discriminatory. *See Toomer v. Witsell,* 334 *U.S.* 385, 68 *S.Ct.* 1156, 92 *L.Ed.* 1460 (1948) (South Carolina laws discriminating against out-of-state commercial fishermen struck down as violative of both the Commerce and Privileges and Immunities Clauses). The analysis is essentially the same under either guarantee. "The business of commercial fishing must be conducted by peripatetic entrepreneurs moving, like their quarry, without regard for state boundary lines." *Douglas v. Seacoast Prods., supra,* 431 *U.S.* at 285, 97 *S.Ct.* at 1752, 52 *L.Ed.*2d at 320. However, the Court explained that "reasonable and evenhanded conservation measures, so essential to the preservation of our vital marine sources of food supply, stand

unaffected by our decision." *Id.* at 287, 97 *S.Ct.* at 1753, 52 *L.Ed.*2d at 321.

The principles of decision are settled:

> In determining whether a State has overstepped its role in regulating interstate commerce, this Court has distinguished between state statutes that burden interstate transactions only incidentally, and those that affirmatively discriminate against such transactions. While statutes in the first group violate the Commerce Clause only if the burdens they impose on interstate trade are "clearly excessive in relation to the putative local benefits," *Pike v. Bruce Church, Inc.*, 397 *U.S.* 137, 142, 25 *L.Ed.*2d 174, 90 *S.Ct.* 844 [847] (1970), statutes in the second group are subject to more demanding scrutiny. The Court explained in *Hughes v. Oklahoma*, 441 *U.S.*, [322] at 336, 60 *L.Ed.*2d 250, 99 *S.Ct.* 1727 [1736], that once a state law is shown to discriminate against interstate commerce "either on its face or in practical effect," the burden falls on the State to demonstrate both that the statute "serves a legitimate local purpose," and that this purpose could not be served as well by available nondiscriminatory means. [*Maine v. Taylor*, 477 *U.S.* 131, 138, 106 *S.Ct.* 2440, 2447, 91 *L.Ed.*2d 110, 120–21 (1986).]

### B.

Plaintiff contends that the regulation in this case discriminates against interstate commerce either "on its face or in 'practical effect.'" We disagree. On its face, New Jersey's regulation does not effect simple protectionism but regulates evenhandedly. That regulation is therefore unlike statutes discriminating against interstate commerce, which the Court has consistently struck down, *e.g.*, *Wyoming v. Oklahoma*, 502 *U.S.* ——, 112 *S.Ct.* 789, 117 *L.Ed.*2d 1 (1992) (Oklahoma statute requiring Oklahoma electric generating plant fired by coal to burn a mixture with at least ten percent Oklahoma-mined coal); *Lewis v. BT Inv. Managers, Inc.*, *supra*, 447 *U.S.* 27, 100 *S.Ct.* 2009, 64 *L.Ed.*2d 702 (Florida scheme prohibiting banks with principal offices out of state from owning investment advisory services); *Hughes v. Oklahoma*, 441 *U.S.* 322, 99 *S.Ct.* 1727, 60 *L.Ed.*2d 250 (1979) (Oklahoma statute prohibiting the transport or shipment outside the state of natural minnows seined from waters within the state); *Philadelphia v. New Jersey*, 437 *U.S.* 617, 98 *S.Ct.* 2531, 57 *L.Ed.*2d 475 (1978) (New Jersey statute prohibiting import of solid and liquid wastes into

the state); *Hunt v. Washington State Apple Advertising Comm'n,* 432 *U.S.* 333, 97 *S.Ct.* 2434, 53 *L.Ed.*2d 383 (1977) (North Carolina statute requiring all apples sold or shipped into the state be graded in a particular manner that in effect imposed additional costs on Washington but not on North Carolina apple shippers). *Hunt* is instructive because although facially neutral, the statute required all apples sold in closed containers to bear the U.S.D.A. grade, which was the grading system used by North Carolina, thus imposing additional costs on out-of-state apple shippers. Those shippers already bore the additional expenses of their own state's grading system.

Merely because plaintiffs' vessels are from out of state does not mean that the regulation has a discriminatory effect. The regulation does not place Ampro at a competitive disadvantage in relation to in-state fishing interests. To illustrate the point, we need consider the argument only as if the regulation had been passed while Seacoast was still operating from its New Jersey plant in Belford but had later withdrawn (as it did when supposedly acquired by Zapata Haynie) to southern waters. Under those circumstances, the regulation would affect only out-of-state fishermen. This effect of course would not be discriminatory. Thus, plaintiff's reliance on *Atlantic Prince, Ltd. v. Jorling,* 710 *F.Supp.* 893 (E.D.N.Y.1989), is misplaced. In that case, New York's ban on squid trawlers in excess of ninety feet (when New York fleets operated only smaller vessels) discriminated against the out-of-state fleets because it denied access to the very fishing stocks that New York fleets were continuing to harvest with their smaller vessels. Such a regulation addresses no "reasonable and evenhanded conservation measure[ ]." *Douglas v. Seacoast Prods., supra,* 431 *U.S.* at 287, 97 *S.Ct.* at 1753, 52 *L.Ed.*2d at 321. Rather, plaintiff is actually arguing that the regulation has a discriminatory purpose.

We acknowledge that in times past legislators sponsoring a two-mile ban on purse seining have noted the departure from the menhaden industry of the Belford-based Seacoast Products

and their support may have suggested a disregard of the legitimate interests of foreign-state fishing fleets. However, the Division of Fish, Game, and Wildlife of the DEPE has never displayed any discriminatory attitude toward the foreign fleets. In fact, DEPE originally opposed the proposed 1.2–mile ban, see *S.* 1372, 201st Leg., 1st Sess. (1984); *S.* 3395, 201st Leg., 2nd Sess. (1985), and later opposed a 2–mile ban. *Hearings, supra,* app. at 18. In the equal-protection analysis the Supreme Court will assume that the objectives articulated by an administrative body are the actual purposes of a regulation unless an examination of the circumstances forces the Court to conclude that the valid state purposes "could not have been a goal of the legislation." *Weinberger v. Wiesenfeld,* 420 *U.S.* 636, 648 n. 16, 95 *S.Ct.* 1225, 1233 n. 16, 43 *L.Ed.*2d 514, 525 n. 16 (1975) (citations omitted). That analysis can be applied here. A review of the administrative history of the regulation supports the conclusion that valid state purposes were a goal of the regulation.

## C.

Because New Jersey's regulation does not discriminate between interstate and intrastate commerce, the controlling question is whether the incidental burden imposed on interstate commerce by the regulation is "clearly excessive in relation to the putative local benefit." *Pike v. Bruce Church, Inc., supra,* 397 *U.S.* at 142, 90 *S.Ct.* at 847, 25 *L.Ed.*2d at 178 (citing *Huron Portland Cement Co. v. Detroit,* 362 *U.S.* 440, 443, 80 *S.Ct.* 813, 815, 4 *L.Ed.*2d 852, 856 (1960)).

At the outset we note that the states have traditionally been given latitude to regulate fishing in their coastal waters. See, *e.g., C.J. Hendry Co. v. Moore,* 318 *U.S.* 133, 63 *S.Ct.* 499, 87 *L.Ed.* 663 (1943) (state may require forfeiture of net used in violation of fishing regulations); *Manchester v. Massachusetts, supra,* 139 *U.S.* 240, 11 *S.Ct.* 559, 35 *L.Ed.* 159 (state may prohibit menhaden fishing in bay).

With that in mind, we turn to the administrative record before the DEPE. That record contains several factors that amply support the benefit of the regulations and the reasonableness of the burden. First, the industry never suggested that any form of regulation would be unconstitutional because of the absence of New Jersey fleets. Rather, the position of the industry was that the 0.6 nautical mile regulation, which became effective in 1983, was sufficient to control menhaden fishing and that increasing it to 1.2 nautical miles was unnecessary. Thus, the debate was about the distance from shore rather than the power of the State to regulate. In revising related regulations in 1984, Commissioner Hughey explained the need to eliminate "spatial conflict," namely, collisions occurring between large bunker boats and in-shore sport fishermen who are said to contribute $600 million a year to the economy of New Jersey. He said: "The primary purpose of the regulations * * * is to lessen conflict between menhaden purse-seine fishermen and our own recreational fishermen." *Emergency Regulations Adopted for Purse–Seine Fishing of Menhaden, Department of Environmental Protection News*, July 12, 1984.

Second, there was evidence that bluefish, striped bass, and weakfish, although not captured within the nets, will leave the area when the purse seiners reduce the in-shore bunker school, because there is nothing for them to feed on. Because the primary feeding stocks of major game fish, mainly the striped bass, live in bay mouths, a speaker at the public hearing on the amendment to the regulations suggested that by assuring that there is better baitfish in the form of menhaden, the breeding grounds would be enhanced without destroying the menhaden industry. In contrast, the primary zone for menhaden fishing is approximately three miles along the coastline. So rather than exclude menhaden fishing entirely from the primary market, a 1.2 nautical mile limit would restrict fishing only in a portion of the primary zone.

Finally, the record before the DEPE also indicated that the states of Maryland, Delaware, North Carolina, South Carolina,

New Hampshire, and New York had enacted comparable restrictions on bunker boats. See, *e.g.*, *Del.Code Ann.* tit. 7, § 919(b) (1991) (prohibiting menhaden fishing within three miles of the shore); *N.Y. Envtl. Conserv. Law* § 13–0333(4) (McKinney 1984) (restricting operating distance of commercial menhaden vessels between shoreline and buoy markers in certain areas).

Surely, then, such regulation is not excessive in relation to the local benefits. Even if we were to find that the regulation required stricter scrutiny to determine whether "alternative means could promote this local purpose as well without discriminating against interstate commerce," *Hughes v. Oklahoma, supra,* 441 *U.S.* at 336, 99 *S.Ct.* at 1736, 60 *L.Ed.*2d at 262, considerable latitude must be given to state regulators. A state "is not required to develop new and unproven means of protection at an uncertain cost." *Maine v. Taylor, supra,* 477 *U.S.* at 147, 106 *S.Ct.* at 2452, 91 *L.Ed.*2d at 126–27. Although the dissenting member, Justice Stevens, candidly stated, "[t]here is something fishy about this case" in which Maine "blatantly discriminates against out-of-state baitfish by flatly prohibiting their importation," *id.* at 152, 106 *S.Ct.* at 2454, 91 *L.Ed.*2d at 129, the Court found "that Maine's ban on the importation of live baitfish serve[d] legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives." *Ibid.* As long as the record suggested that Maine had legitimate reasons "apart from their origin, to treat [out-of-state baitfish] differently," Maine's flat ban could stand. *Ibid.* (quoting *Philadelphia v. New Jersey, supra,* 437 *U.S.* at 627, 98 *S.Ct.* at 2537, 57 *L.Ed.*2d at 483).

New Jersey's regulation falls far short of a flat ban. The record in this case amply demonstrates that the New Jersey regulators had legitimate reasons, apart from their origin, to treat the out-of-state menhaden fishermen as they did. Indeed, they were not treated differently from anyone else. New Jersey should not be prevented from correcting in-shore problems simply because New Jersey fleets have withdrawn from

the state. If a developed record showed that New Jersey imposed a clearly excessive burden on interstate commerce, we could not foreclose a renewed challenge to the reasonableness of the New Jersey regulations. That record should include, as well, a comparison with the burdens on the harvest elsewhere.

We find no merit in Ampro's final constitutional challenge. Because Congress has not expressed its intent to displace state action in this field, the Supremacy Clause does not prevent the DEPE from regulating in this area.

## IV

The final issue pertains to state administrative law, specifically, Ampro's contention that the regulations are *ultra vires*. The Marine Fisheries Management and Commercial Fisheries Act, *N.J.S.A.* 23:2B-1 to -18, recognizes that fishery resources contribute to recreation as well as to other uses and that the distribution and allocation of fishery resources must be assigned. *See N.J.S.A.* 23:2B-2. The Act allows the Marine Fisheries Council to study "economic, social and ecological data relating to the operation of the marine fisheries program." *N.J.S.A.* 23:2B-5h. The Act further authorizes regulations that may

> [p]rohibit, limit, condition, require or establish the use of specified types of fishing gear; the size, number and quantity of specific species that may be taken; the areas to be opened or closed to their taking, the time and manner of their taking; and may prescribe such other limitations, conditions, requirements, or restrictions as is necessary and appropriate to the policy and purposes of this act. [*N.J.S.A.* 23:2B-6a.]

Those regulations are well within the scope of the enabling act. They address precisely the "reasonable and evenhanded conservation measures, so essential to the preservation of our vital marine sources of food supply." *Douglas v. Seacoast Prods., supra,* 431 *U.S.* at 287, 97 *S.Ct.* at 1753, 52 *L.Ed.*2d at 321.

A delicate balance must be maintained to preserve the resources of the sea for this and future generations. To return to the previously-cited words of the recreational fisherman:

Fish are a common resource. They belong to no one sport or commercial. We have no more right to believe they belong to us than commercial men do in believing they are theirs. Long before our country was born the colonists fished together—recreational and commercial. This is the way it has been and should be. There is enough for us all, and in this spirit we should each respect the rights of the other. In my opinion, a fisherman is a fisherman, and what hurts one hurts us all. [*Hearings, supra,* at app. 34.]

Maintaining the balance between the rights of those who pursue the fish and the preservation of the fish has been primarily delegated to the Marine Fisheries Council. The Atlantic States Marine Fisheries Commission should be empowered to resolve any undue interference by one of the states with the common resource. As we have seen, many of our sister states have purse-seine regulations similar to those enacted by New Jersey's Marine Fisheries Council. For instance, Delaware bans the fishing of menhaden within three miles of the shore, *Del.Code Ann.* tit. 7, § 919(b) (1991); New York restricts operating distances of menhaden vessels between the shoreline and buoy markers in certain areas, *N.Y. Envtl. Conserv. Law* § 13–0333(4) (McKinney 1984); Maryland prohibits fishing with purse nets for any reason in the tidal waters of the state, *Md.Nat.Res.Code Ann.* § 4–710 (1991); and North Carolina prohibits the taking of menhaden with purse seines in the Atlantic Ocean within a delineated area and further prohibits menhaden fishing within one mile of the shoreline except from January 16 to May 14. *N.C.Gen.Stat.* § 113–182 (1990); *N.C.Admin.Code* tit. 15A r.03R.0011 (Jan. 1991). Absent evidence of economic protectionism directed at out-of-state fishing fleets or clear abuse of authority, courts do well to recognize that the complex regulation of fisheries resources is within the primary jurisdiction of the councils established under state and federal law.

The judgment of the Appellate Division is reversed in part and affirmed in part. The validity of the regulations is affirmed.

*For reversal in part: affirmance in part*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, POLLOCK, GARIBALDI, and STEIN—7.

*Opposed*—None.