IN THE MATTER OF NJPDES PERMIT NO. NJ 0055247, ET AL.

Superior Court of New Jersey
Appellate Division

Argued January 21, 1987—Decided February 20, 1987.

2

Before Judges PRESSLER, BAIME and ASHBEY.

*Michael Gordon* argued the cause for appellants (*Gordon & Gordon*, attorneys; *Timothy S. Haley*, on the brief).

*Nancy B. Stiles*, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (*W. Cary Edwards*, Attorney General of New Jersey, attorney; *James J. Ciancia*, Assistant Attorney General, of counsel, *Nancy Stiles*, on the brief).

*H. Curtis Meanor*, Acting Essex County Counsel, argued the cause for respondent Essex County (*Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan*, attorneys; *David L. Harris*,

*Stephen H. Skoller, Sandra S. Greenstein, Norman W. Spindel* and *Mark A. Chertok,* on the brief).

*Mark A. Chertok,* admitted *pro hac vice,* argued the cause for respondent American Ref-Fuel (*Carella, Byrne, Bain & Giffillan* and *Sive, Paget & Riesel,* attorneys).

The opinion of the court was delivered by

BAIME, J.A.D.

These are consolidated appeals by the Ironbound Committee Against Toxic Waste and seven named individuals from the issuance of four permits by the Department of Environmental Protection (DEP) authorizing respondent American Ref-Fuel Company (Ref-Fuel) to construct a resource recovery facility in the City of Newark.[1] Although appellants purport to appeal from the issuance of four permits,[2] only two are actually challenged. More specifically, appellants attack the action of the DEP in issuing an Air Pollution Control Permit and a Solid Waste Permit. Our thorough review of appellants' brief re-

---

[1] In the regulations, the terms resource recovery facility and resource recovery source are used interchangeably. A resource recovery source is defined in *N.J.A.C.* 7:27–18.1 as

> any equipment used for processing solid waste (including refuse derived fuel and sewage sludge) for the purpose of extracting, converting to energy or otherwise separating and preparing solid waste for reuse. For the purpose of this subchapter energy conversion equipment must use solid waste to provide more than 50% of the heat input to be considered a resource recovery source.

[2] The NJPDES permit was issued pursuant to the Water Pollution Control Act, *N.J.S.A.* 58:10A–1 *et seq.,* and the regulations at *N.J.A.C.* 7:14–1 *et seq.* The Water Supply Allocation Permit was issued pursuant to the Water Supply Management Act, *N.J.S.A.* 58:1A–1 *et seq.* The Air Pollution Control Permit was issued pursuant to the Air Pollution Control Act, *N.J.S.A.* 26:2C–1 *et seq.,* and the regulations at *N.J.A.C.* 7:27–1 *et seq.* The Solid Waste Permit was issued pursuant to the Solid Waste Management Act, *N.J.S.A.* 13:1E–1 *et seq.,* and the regulations at *N.J.A.C.* 7:26–1 *et seq.*

veals no specific challenge to the DEP's issuance of a NJPDES Permit[3] or a Water Supply Allocation Permit.[4]

Although ambiguously phrased, appellants advance one substantive and four procedural arguments in support of their claim that the permits were issued unlawfully. Substantively, appellants challenge the Air Pollution Control Permit on the basis that the emission limitation for particulate matter is not sufficiently stringent and that the applicable regulatory provisions obliged the DEP to require the use of more advanced anti-pollutant equipment. Procedurally, appellants argue that the DEP acted improperly by prematurely issuing the Solid Waste Permit. They claim that prior to issuance of the permit the DEP should have required Ref-Fuel to submit a full disclosure statement and background review check of all the company's principals. Appellants also assert that the permit was issued improperly because Ref-Fuel failed to designate a back-up residual landfill. They further contend that before issuing the permit the DEP was required to comply with the legislative directive set forth in *N.J.S.A.* 13:1E–168a(2) which mandates the promulgation of rules and regulations providing for state-of-the-art air emission technology for resource recovery facilities. Finally, appellants argue that the DEP improperly obtained and used technical information not available at the time of the public hearings thereby precluding meaningful comment and review by interested citizens and groups.

We have carefully reviewed the record and find no merit in any of the contentions advanced. We are thoroughly convinced that the DEP complied meticulously with all federal and state statutory and regulatory provisions. We are also entirely satisfied that the factual findings and conclusions reached by

[3]The NJPDES Permit was issued to allow a discharge of surface waters from the facility site and the adjacent off-site area, both during and after construction of the facility.

[4]The Water Supply Allocation Permit was issued to allow the temporary diversion of groundwater during construction of the facility.

the DEP are amply supported by substantial evidence present in the record and that the agency did not act in an arbitrary or capricious manner. We affirm.

The salient facts are not in dispute and are essentially a matter of public record. In July 1979, the Essex County Board of Freeholders adopted a solid waste management plan which provided for the development of a resource recovery facility. The plan was subsequently amended to reflect an agreement between the Essex County Division of Solid Waste Management and the Industrial Development Department of the Port Authority which, among other things, designated Blanchard Street in Newark as the site for the proposed facility. Both the original plan and the modifications were approved by the DEP and Ref-Fuel was ultimately selected through the competitive bidding process to construct the facility.

On December 14, 1983, Ref-Fuel submitted to the Division of Waste Management a "solid waste facility application package" including a comprehensive engineering design and environmental impact statement. Following its review of the documents submitted, the Division issued draft permits for operation of the proposed facility and scheduled a public hearing. The DEP gave notice that public comments would be accepted between November 17, 1984 and January 18, 1985 and that a hearing would be conducted on December 17, 1984. The notice stated that the DEP would consider all comments presented and would issue responses to all significant issues raised. The notice also apprised the public of the locations where copies of the draft permits and supporting applications could be obtained. So too, the DEP promised to furnish additional information upon request.

We need not recount specifically what transpired at the public hearings. Suffice it to say, the hearings took place over the course of several days. Seventy individuals testified and approximately one thousand people attended.

After the conclusion of the hearings and the public comment period, the DEP forwarded all materials to three consultants it had retained for their review and response. Among the factors to be reviewed were the combustion system design especially with regard to dioxin emissions, risk assessments for selected air contaminants which the proposed facility would emit and the advantages and disadvantages of alternative air pollution control systems.

Following receipt of the reports submitted by the consultants, the DEP's hearing officer issued his final recommendations. The hearing officer's findings and conclusions are set forth in an extremely comprehensive report. The hearing officer recommended that the DEP approve the permits contingent upon Ref-Fuel's acceptance of several revisions, modifications and additions. These changes included (1) increased monitoring of emission data and periodic transmission of such information to the DEP, (2) reduction of the "allowable emission concentration of particulate matter from 0.02 to 0.015 grains per dry standard cubic foot of stack gas" and (3) reduction of the duration of the registration from ten to five years. These conditions were ultimately incorporated in the DEP's final permit approvals which became effective on December 30, 1985. These appeals followed.

I

We first address appellants' argument that the emission limitations set forth in the DEP's approval is not sufficiently stringent. Appellants contend that anti-pollutant equipment utilized in other states and municipalities has resulted in lower emission rates than that allowed by the permit issued by the DEP. Appellants assert that the DEP acted in an arbitrary and capricious manner in not requiring Ref-Fuel to employ advanced technology and in allowing a higher emission rate than that which can otherwise be achieved.

A brief description of the federal and state statutory and regulatory provisions is necessary for a full understanding of the issues presented. The federal Clean Air Act, 42 *U.S.C.* § 7401 *et seq.*, divides regions into attainment and nonattainment areas. 42 *U.S.C.* § 7407. Those areas with pollutant levels at or below national air quality standards as defined by the federal Act constitute "attainment areas." 42 *U.S.C.* § 7407. Those with pollutant levels above the maximum air quality standards are "nonattainment areas." 42 *U.S.C.* § 7407 and § 7501(2).

A facility which is located in an attainment area must employ an emission limitation which reflects the "best available control technology." (BACT). BACT is defined in the federal Act as:

[a]n emission limitation based on the maximum degree of reduction of each pollutant ... which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques.... [42 *U.S.C.* § 7479(3)].

BACT does not require any particular engineering design. Rather, it mandates an achievable limitation taking into account certain factors enumerated in the regulations. Significantly, BACT involves a balancing of economic and technological considerations.

If, on the other hand, the facility is located in a nonattainment area, far more stringent standards are applied. Specifically, the applicant must use technology capable of achieving the "lowest available emission rate" (LAER). Under the Act, LAER is defined as:

[t]hat rate of emissions which reflects

(A) the most stringent emission limitation which is contained in the implementation [plan] of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

(B) the most stringent emission limitation which is achieved and practice by such class or category of source, whichever is more stringent. [42 *U.S.C.* § 7501(3)].

Obviously, LAER is a more stringent emissions limitation because it bars consideration of cost and other factors enumerated in the definition of BACT.

The federal Act contains one further refinement designed to insure effective regulation of emissions. When it adopted the federal Act, Congress conferred upon the states the primary authority for enforcing proper air quality in their respective geographic areas. 42 *U.S.C.* § 7407(a). If a state has a program that is essentially equivalent or more stringent than the federal regulatory scheme, it can seek authorization from the Environmental Protection Agency to administer its standards in lieu of its federal counterparts. New Jersey has received full authorization to apply its standards in both attainment and nonattainment areas. *See* 40 *C.F.R.* § 52.157; 46 *Fed.Reg.* 21996 (April 15, 1981); 48 *Fed.Reg.* 16738 (April 19, 1983).

Essex County is a nonattainment area for particulates and the entire state is a nonattainment area for ozone. Under New Jersey regulations, "[e]ach new or altered equipment and facility is controlled to the degree which represents the lowest available emission rate (LAER) for the relevant criteria pollutant." *N.J.A.C.* 7:27–18.2(c)(1). LAER is defined by the New Jersey regulation as:

> the rate of emission from any equipment, facility, or control apparatus which incorporates advances in the art of air pollution control developed for the kind and amount of air contaminant emitted by the equipment or facility. For the purposes of this subject, advances in the art of air pollution control shall result in an emission limitation at least as stringent as:
>
> (1) The most stringent emission limitation which is contained in the implementation plan of any state for such class or category of equipment or facility, unless the owner or operator of the proposed equipment or facility demonstrates that such limitations are not achievable; or
>
> (2) The most stringent emission limitation which is achieved in practice by such class or category of equipment of facility; whichever is more stringent. In no event shall the application of this term permit proposed new or altered equipment or facilities to emit any pollutant in excess of the amount allowable under applicable federal new source standards of performance. [*N.J.A.C.* 7:27–18.1].

In addition, New Jersey regulations impose a requirement that the equipment used "incorporates advances in the art of air pollution control developed for the kind and amount of air

contaminant emitted by the applicant's equipment." *N.J.A.C.* 7:27–8.4(b).

It is against this statutory and regulatory backdrop that we consider appellants' contentions. Appellants argue that the permits issued by the DEP do not require the use of the best available control technology (BACT). As accepted by the DEP, the proposed facility's air pollution control technology would include oil-fired burners, dry scrubbers and an electrostatic precipitator.[5] Appellants assert that the DEP should have required a fabric filter[6] rather than an electrostatic precipitator. They contend that a fabric filter is required by the BACT standard. Appellants also claim that the DEP's approval of 0.015 grains per dry standard cubic foot does not comport with LAER.

We reject these contentions. Initially, we note that appellants' citation of the BACT standard is clearly incorrect. As we have noted, Essex County is a nonattainment area for particulates and the entire state is a nonattainment area for ozone. Hence, BACT is inapplicable. Rather, it was incumbent upon the DEP to apply the LAER standard. Because New Jersey has been authorized to enforce its own program which, as we have observed, is more stringent than its federal counterpart, the DEP was required to apply the LAER standard set forth in *N.J.A.C.* 7:27–18.2(c)(1) and the "advances in the art" standard set forth in *N.J.A.C.* 7:27–8.4(b).

Based upon those standards, we are entirely satisfied that the findings and conclusions of the DEP are fully supported by substantial credible evidence present in the record. *Mayflower Securities v. Bureau of Securities*, 64 *N.J.* 85,

---

[5] An electrostatic precipitator collects dust particles by drawing them to collection plates using a powerful electric field.

[6] A fabric filter, also known as a bag house, separates particles by either gravity settling, direct sieving, impingement, diffusion and/or electrostatic attraction.

92–93 (1973); *Close v. Kordulak,* 44 *N.J.* 589, 599 (1965). We are equally convinced that the determinations of the DEP were not arbitrary or capricious. The fact that one of the consultants retained by the DEP reached a conclusion different from that ultimately adopted by the agency does not compel a different result.[7] We are to review the action of the DEP, not that of the consultant. Where as here, the Legislature has entrusted an administrative agency with the responsibility of selecting the means of achieving an articulated statutory policy, the relation or nexus between the remedy and the goal sought to be accomplished is peculiarly a matter for administrative competence. *In re Marvin Gastman,* 147 *N.J.Super.* 101, 110 (App.Div.1977). It is a basic tenet of judicial review that the courts are not free to substitute their judgment for that of the administrative agency charged with the responsibility of executing a policy enunciated by the Legislature. *See Barry v. Arrow Pontiac, Inc.,* 100 *N.J.* 57, 70–71 (1985); *Bergen Pines Hosp. v. Dept. of Human Services,* 96 *N.J.* 456, 477 (1984); *Dougherty v. Human Services Dep't,* 91 *N.J.* 1, 12 (1982); *New Jersey Guild of Hearing Aid Dispensers v. Long,* 75 *N.J.* 544, 561 (1978). In sum, we are fully convinced that the DEP's resolution of the issues presented was entirely reasonable and that its findings and conclusions are amply supported by the record.

## II

Appellants next contend that the DEP unlawfully issued the Solid Waste Permit without first requiring Ref-Fuel to submit a disclosure statement. We reject this argument.

The Solid Waste Management Act (*N.J.S.A.* 13:1E–1 *et seq.*) requires an applicant to submit a disclosure statement including the names of all principals along with various forms of relevant

---

[7]In a somewhat equivocal fashion, the consultant recommended that a fabric filter might produce a better result than an electrostatic precipitator.

personal information. *See N.J.S.A.* 13:1E–127e and *N.J.S.A.* 13:1E–128a. For each individual listed, the applicant must reveal all past involvement in the solid waste industry, all administrative actions taken in connection with such involvement and all federal, state and local judgments of liability or convictions entered against that person. *N.J.S.A.* 13:1E–127e(4), (5) and (6). This information is to be submitted to the Attorney General who is to prepare an investigative report. *N.J.S.A.* 13:1E–128. If the applicant does not meet the standards set forth in *N.J.S.A.* 13:1E–133, the DEP is barred from issuing a Solid Waste Permit.

In an unpublished decision rendered on April 3, 1985, the United States District Court declared these sections unconstitutional and issued an injunction barring their enforcement. On December 19, 1985, the Court of Appeals for the Third Circuit reversed that decision. *Trade Waste Management Ass'n, Inc. v. Hughey,* 780 *F.*2d 221, 223 (3 Cir.1985). However, the mandate to the District Court did not issue until after the disposition of a petition for rehearing *en banc. See Fed.R. App.P.* 41. The mandate ultimately issued on January 23, 1986.

This chronology clearly discloses that the District Court's injunction remained in effect on December 10, 1985, when the Solid Waste Permit was issued to Ref-Fuel. Under these circumstances, the DEP lacked the authority to require Ref-Fuel to file a disclosure statement at the time the permit was issued.

In any event, we note that under *N.J.S.A.* 13:1E–128(a), "[e]very licensee who is not otherwise required to file a disclosure statement within two years of the effective date of the [Solid Waste Management] Act shall file [such] a ... statement with the [DEP] and the Attorney General...." Pursuant to that section, Ref-Fuel submitted its disclosure statement on April 18, 1986. Apparently, the Attorney General's investigation mandated by *N.J.S.A.* 13:1E–128 is presently ongoing. Should the DEP determine that Ref-Fuel is not entitled to a

permit, the DEP has advised us that it will commence revocation proceedings. *See N.J.S.A.* 13:1E–134. We are convinced that the public interest is adequately protected by this procedure and we thus perceive no justifiable reason to intervene.

### III

We also find no merit in appellants' argument that Essex County's failure to designate a residual landfill in the district's solid waste management plan violated the Solid Waste Management Act, thereby precluding the DEP from issuing the permits challenged here. Appellants claim that the district's solid waste management plan does not adequately identify suitable sites for treatment of all solid waste projected for the next ten years as required by *N.J.S.A.* 13:1E–21b. They also contend that *N.J.A.C.* 7:26–2.12(c)(8) requires the designation of a landfill for all residuals prior to issuance of a permit to construct and operate a resource recovery facility. We review these contentions *seriatim.*

We are convinced that issuance of the permits did not violate any of the provisions of the Solid Waste Management Act. That statutory scheme is described in great detail in *A.A. Mastrangelo, Inc. v. Environmental Protec. Dep't,* 90 *N.J.* 666 (1982) and it would be superfluous for us to engage in an extensive discussion of its provisions here. Under the Act, the DEP is given the central planning role and is required to formulate, promulgate and review biennially a state-wide solid waste management plan. *N.J.S.A.* 13:1E–6(a)(3). Each of the 22 districts is then required to adopt its own district-wide plan, *N.J.S.A.* 13:1E–20 and 21, which is to be submitted to the Commissioner of the DEP who in turn is required to forward it to various state agencies for their review. *N.J.S.A.* 13:1E–24. The Act further provides that "[e]very [district's] solid waste management plan shall be developed and formulated for a period of [ten] years...." *N.J.S.A.* 13:1E–20(a)(1). The Com-

missioner must either approve, reject or modify the district plan. *N.J.S.A.* 13:1E–24b.

Appellants contend that the plan adopted by Essex County and approved by the Commissioner failed to designate a residual landfill and thus does not comport with the requirements of the Act. The short answer to this argument is that questions concerning the adequacy or inadequacy of Essex County's solid waste management plan are not properly before this court. The appropriate vehicle for resolution of that issue would have been an appeal from the determination of the Commissioner approving the district's solid waste management plan.

The relevant issue presented by this appeal is whether the DEP properly issued the Solid Waste Permit, not whether the Commissioner unlawfully approved Essex County's solid waste management plan. *Cf. In re Application Combustion Equipment Assocs.,* 169 *N.J.Super.* 305, 315 (App.Div.1979). So posited, our inquiry must focus upon whether the resource recovery facility as proposed by Ref-Fuel is in any way repugnant to the solid waste management plan adopted by Essex County and approved by the Commissioner. In that context, *N.J.S.A.* 13:1E–26a provides that the DEP approval of a solid waste facility shall be granted only if "[t]he proposed construction, acquisition or operation is consistent with the adopted and approved or promulgated solid waste management plan of the solid waste management district within which the ... facility is to be located."

Applying that statutory standard, we perceive no inconsistency between the proposed facility and the district's solid waste management plan. We note that the DEP's approval is expressly conditioned upon Ref-Fuel's identification of a residual landfill. The Certificate of Registration and Engineering Design Approval mandates that:

Prior to the initiation of the facility start-up and shakedown period, the Registrant shall identify a hazardous waste disposal facility capable of handling any ash residue generated that may be proven hazardous during the monitoring/analysis program. The Registrant shall present documentation to the

> Department which demonstrates the disposal facility's willingness and ability to accept the type and quantity of material that may be slated for disposal. The sanitary landfill to be utilized for residual ash disposal (if the ash is characterized as non-hazardous) shall be identified by the Registrant prior to the start-up and shakedown period, and documentation of the agreement made with the sanitary landfill facility shall be submitted to the Department for review and approval. *The agreement shall be accompanied by the appropriate documentation indicating that the necessary waste flow directives have been obtained in conformance with the approved District Solid Waste Management Plan.*

In our view, the DEP's approval fairly comports with Essex County's solid waste management plan. We have no occasion to address whether the district will be required to formally amend its plan when it determines the site of the residual landfill. *N.J.A.C.* 7:26–6.6. *Cf. In the Matter of Certain Amendments to the Adopted and Approved Solid Waste Management Plan of the Camden County Solid Waste Management District,* 214 *N.J.Super.* 247 (App.Div.1986) We merely find that the proposed facility is consistent with the district's plan.

■ Equally devoid of merit are appellants' argument that *N.J.A.C.* 7:26–2.12 requires an applicant for a permit to operate a resource recovery facility to designate a residual landfill in its engineering design plan. That regulation applies to incinerators. *N.J.A.C.* 7:26–2.12(c). *N.J.A.C.* 7:26–1.4 defines an incinerator as "a thermal device in which solid waste is burned for the purposes of volume reduction...." The Regulation further provides that "an incinerator used to obtain energy shall be classified as a resource recovery facility." *N.J.A.C.* 7:26–1.4. *N.J.A.C.* 7:26–2.12(d) lists requirements for resource recovery facilities and does not mandate designation of a residual landfill.[8] In sum, we find no statutory or regulatory impediment to issuance of a permit for the construction and operation of a

---

[8] An amendment to the regulations has been proposed by the DEP which would obliterate the distinction between an incinerator and a resource recovery facility. 18 *N.J.R.* 883, 918–921 (May 5, 1986). As noted, present regulations concerning resource recovery facilities do not require designation of a residual landfill.

resource recovery facility by virtue of the failure to designate a residual landfill.

## IV

█ We also reject appellants' argument that the permits were issued unlawfully because the DEP failed to adopt regulations requiring state-of-the-art air pollution control technology for resource recovery facilities as directed by *N.J.S.A.* 13:1E–168a(2). That section, which became effective on February 4, 1985, provides that:

> [t]he department shall adopt rules and regulations for the engineering design of resource recovery facilities, to include a requirement that state-of-the-art air emission technology be installed to control the emission of ... acid gases and pollutants from each resource recovery facility which is expected to emit these pollutants. [13:1E–168a(2)].

Appellants contend that the DEP was barred from issuing any permits until it complied with the statutory mandate.

We disagree. We discern no legislative intent to halt issuance of all permits for waste disposal facilities until the DEP adopts regulations requiring installation of state-of-the-art emission technology. Obviously, engineering design of resource recovery facilities involves highly technical information which cannot be obtained and assimilated in a speedy manner. We do not believe that the Legislature intended to compel cessation of all permits for a potentially lengthy time period, particularly in light of the waste disposal crisis presently confronting our state. When a statute directs an administrative agency to adopt regulations already subject to a licensing scheme, the agency is neither required nor expected to halt all pending permit proceedings and hold them in abeyance pending the finalization of the rule making process, a historically lengthy administrative action. Rather, agencies must be afforded a reasonable time to promulgate rules.[9] *See Data*

---

[9]In response to the statutory direction, the DEP has proposed a regulation which requires that "combustion systems shall be equipped with state-of-the-art

*Access System, Inc. v. State,* 117 *N.J.Super.* 95, 102 (App.Div. 1971), rev'd on other grounds, 63 *N.J.* 158 (1973).

We further observe that regulations currently in force already require use of state-of-the-art emission control technology. As we pointed out previously, *N.J.A.C.* 7:27–8.4(b) presently requires that the engineering design "incorporates advances in the art of air pollution control. . . ." This regulation, as interpreted and applied by the DEP, encompasses the requirement that state-of-the-art technology must be installed. We are entirely satisfied from our exhaustive review of the record that the DEP strictly applied that standard in this case.

## V

■ Appellants' final argument is that the public was not afforded an appropriate opportunity to provide comment at the hearings conducted by the DEP. In support of this contention, appellants claim that the "fact sheet" transmitted to the City of Newark pursuant to *N.J.S.A.* 13:1E–5.1c did not contain sufficient information. They also assert that the public was not accorded a meaningful opportunity to review the proposal because the DEP ultimately relied upon reports of consultants which were furnished to the agency after the public hearings and comment period had concluded.

We find no merit in these contentions. *N.J.S.A.* 13:1E–5.1c states that "[a]ll tentative approvals of applications granted . . . shall be transmitted to the applicant and to the affected municipality and shall be accompanied by a fact sheet setting forth the principal facts and the significant factual, legal, methodological and policy questions considered in granting the tentative

air emission technology. . . ." *N.J.A.C.* 7:26–2B.4(b)5 (proposed); 18 *N.J.R.* 920. Appellants contend that this standard is so general as to require a case-by-case adjudicatory hearing under *N.J.S.A.* 52:14B–2(b). We have no occasion to address this issue except to note that no statute or regulation expressly requires an adjudicatory hearing. *See N.J.S.A.* 52:14B–2 (definition of "contested case.")

approval." The obvious purpose of this section is to give interested persons sufficient information to enable them to review and evaluate the proposal and provide the DEP with their views. Our review of the fact sheet convinces us that the DEP complied fully with the statutory requirement.

■ We also reject appellants' argument that the public hearings were inadequate because the DEP relied partially upon information given to it by the consultants after the public comment period had concluded. Appellants cite no statutory regulation or judicial decision which imposes upon the DEP the obligation of completing all research and investigation prior to the public comment period, and we find none.[10] We further observe that the salutary purpose underlying the requirement of public hearings and public comment was materially advanced in this case. Comments submitted by the public were evaluated by the consultants retained by the DEP and ultimately led to substantial changes in the final permits granted. In short, we find no deviation from the statutory mandate set forth in *N.J.S.A.* 13:1E–5.1c.

## VI

Our thorough review of the record in light of the arguments advanced by appellants convinces us that the permits were properly granted. Accordingly, the action of the DEP in issuing all four permits is affirmed in all respects.

---

[10] In *National Wildlife Federation v. Marsh*, 568 *F.Supp.* 985 (D.D.C.1983), various environmental groups successfully challenged the issuance of a permit by the Secretary of the Army to build an oil refinery. The Court found that a key report essential to the agency's determination was included in the record only after the public comment and hearing period had been ended. *Id.* at 994. Since the "pivotal analysis" which formed the basis of the agency's decision was not provided until after the hearings had concluded, the Court held that the public was denied the opportunity to offer "meaningful comments." *Ibid.* Suffice it to say, we find no similar deficiency in this case.