641 A.2d 1043

IN THE MATTER OF FINAL AGENCY DECISION BY NEW JER-
SEY DEPARTMENT OF HEALTH REGARDING UTILIZATION
AND QUALITY REVIEW FOR CALENDAR YEAR 1993.

AXIOM REVIEW, A CORPORATION OF THE STATE OF NEW
JERSEY, PLAINTIFF–RESPONDENT, v. BARNERT MEMORI-
AL HOSPITAL, BETH ISRAEL MEDICAL CENTER OF PASSA-
IC, CHRIST HOSPITAL, CLARA MAASS MEDICAL CENTER,
ELIZABETH GENERAL MEDICAL CENTER, GENERAL HOS-
PITAL CENTER AT PASSAIC, GREENVILLE HOSPITAL, HOS-
PITAL CENTER AT ORANGE, MEADOWLANDS HOSPITAL
MEDICAL CENTER, MUHLENBERG REGIONAL MEDICAL
CENTER, OVERLOOK HOSPITAL, ST. ELIZABETH HOSPITAL,
ST. FRANCIS HOSPITAL, ST. JAMES HOSPITAL, ST. MI-
CHAEL'S MEDICAL CENTER, UNION HOSPITAL, UNITED
HOSPITALS MEDICAL CENTER, EAST ORANGE GENERAL
HOSPITAL, WEST HUDSON HOSPITAL, ST. MARY'S HOSPI-
TAL, ST. MARY'S AMBULATORY CARE HOSPITAL, AND NEW
JERSEY HOSPITAL ASSOCIATION, APPELLANTS.

NORTH JERSEY PHYSICIANS REVIEW, INC., PLAINTIFF–
RESPONDENT, v. MORRISTOWN MEMORIAL
HOSPITAL, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 14, 1994—Decided April 7, 1994.

206

208

Before Judges COLEMAN, THOMAS and LEVY.

*Frank R. Ciesla* argued the cause for appellants New Jersey Hospital Association and all referenced hospitals, and for intervenors New Jersey Hospital Association and Bergen Pines County Hospital (*Giordano, Halleran & Ciesla*, attorneys; *Mr. Ciesla*, of counsel; *Elizabeth Dusaniwskyj* and *Todd R. Staretz*, on the brief).

*James J. Madden* argued the cause for intervenor Peer Review Organization of New Jersey, Inc. (*Madden, Madden & Del Duca*, attorneys; *Mr. Madden*, of counsel; *Damien O. Del Duca*, on the brief).

*David H. Ben–Asher* argued the cause for plaintiff-respondent-intervenor Axiom Review (*Rabner, Allcorn & Meislik*, attorneys; *Mr. Ben–Asher*, on the brief).

*Mary F. Rubinstein*, Deputy Attorney General, argued the cause for respondent New Jersey Department of Health (*Deborah T. Poritz*, Attorney General of New Jersey, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Ms. Rubinstein*, on the brief).

*Susan Danielson Bonfield* argued the cause for appellants Hospital Center at Orange and St. Elizabeth Hospital (*Cohen, Shapiro, Polisher, Shiekman* and *Cohen*, attorneys; *Murray J. Klein*, of counsel; *Mr. Klein, Ms. Bonfield* and *Holly T. Riblet*, on the brief).

*Douglas S. Brierley* argued the cause for defendant-appellant Morristown Memorial Hospital (*Schenck, Price, Smith & King*, attorneys; *Mr. Brierley, Stephen Sepaniak* and *M. Sheilah O'Halloran,* on the brief).

*David C. Wallace* argued the cause for plaintiff-respondent North Jersey Physicians Review, Inc.

The opinion of the court was Delivered by

COLEMAN, P.J.A.D.

Under the Health Care Facilities Planning Act, as amended by *L.* 1978, *c.* 83, *N.J.S.A.* 26:2H–1 *et seq.*, administrative regulations were promulgated to institute and implement a Diagnosis Related Group (DRG) method of payment or reimbursement to hospitals for inpatient care. A second system was established, under the authority of Chapter 83, known as State-qualified utilization review organizations (UROs), "to ensure that the hospital services which are provided are appropriate, necessary, and of high quality." *N.J.A.C.* 8:31B–3.76(a).

On November 30, 1992, the Health Care Reform Act of 1992, *L.* 1992, *c.* 160, codified at *N.J.S.A.* 26:2H–18.51 *et seq.*, was enacted into law. Sections 40 and 41 of Chapter 160 repealed some of the provisions of Chapter 83 which formed the statutory basis for some of the regulations pertinent to this appeal. Significantly, the Health Care Reform Act abolished the DRG payment system effective January 1, 1993, established a "transition year" methodology for 1993, and deregulated the hospital reimbursement system effective January 1, 1994.

These appeals focus on whether the hospitals were required to permit State-qualified UROs to conduct reviews during the 1993 transition year and whether the hospitals were required to pay for those reviews. The period between January 1, 1993, and December 31, 1993, is the transition year. *N.J.S.A.* 26:2H–18.53a. In recognition of the fact that the Health Care Reform Act made major changes in the system for hospital reimbursements, some of which became effective January 1, 1993, counsel for the New

Jersey Hospital Association (Hospital Association) sought guidance from the Department of Health (DOH). On January 22, 1993, counsel for the Hospital Association sent a letter to the DOH asking for clarification of the DOH's position regarding the functions of State-qualified URO's and the method of paying them during 1993. The DOH responded in a memorandum dated April 2, 1993, which forms the basis for the appeals. It informed the hospitals how UROs were to function during 1993 and why the hospitals were expected to collect sufficient funds from payors to pay for the URO services.

The Hospital Association filed an appeal on April 27, 1993, under docket number A–4132–92T3, from the DOH memorandum. We permitted two State-qualified UROs, Axiom Review, Inc. (Axiom), and Peer Review Organization of New Jersey, Inc. (Peer Review), to intervene in that appeal. In addition, Axiom filed a Verified Complaint in the Chancery Division against Barnert Memorial Hospital and twenty other hospitals. The Hospital Association was permitted to intervene. These hospitals and the Hospital Association have appealed, by leave granted, under docket number A–342–93T3, from an order directing the hospitals to permit Axiom to conduct its utilization review functions for 1992 and 1993 and to pay Axiom for services to be rendered. We stayed the payment provisions of the order pending appeal.

On September 28, 1993, another URO, North Jersey Physicians Review, Inc., obtained an order directing Morristown Memorial Hospital to allow that URO access to patient records to perform its utilization reviews pursuant to N.J.A.C. 8:31B–3.76. Morristown Memorial Hospital has filed an appeal from that order, by leave granted, under docket number A–778–93T3F. We now consolidate all three appeals for disposition.

## I

### A. Before Chapter 160

These appeals require some historical understanding of hospital reimbursements for inpatient care and the functions of UROs

prior to December 31, 1992. The Health Care Facilities Planning Act of 1971, *L.*1971, *c.* 136, established a prospective hospital rate setting scheme for Blue Cross and certain federally funded programs such as Medicaid. The Act was amended in 1978 because of spiraling costs of institutional care. *Riverside Gen. Hosp. v. New Jersey Hosp. Rate Setting Comm'n,* 98 *N.J.* 458, 460–461, 487 *A.*2d 714 (1985). These amendments, known as Chapter 83, declared a public policy of cost containment of hospital rates. The cost containment contemplated by Chapter 83 was to be achieved primarily by shortening patients' hospital stays. *In re Schedule of Rates for Barnert Memorial Hosp.,* 92 *N.J.* 31, 35–36, 455 *A.*2d 469 (1983). The system was designed to set a "prospective rate of reimbursement" (that is, in advance of the actual provision of services to patients). *In re Amendment of N.J.A.C. 8:31B–3.31,* 119 *N.J.* 531, 536, 575 *A.*2d 481 (1990). In addition, unlike its predecessors, Chapter 83 extended the State's supervision and control of hospital rates to all "payors" of hospital services, including the uninsured. *N.J.S.A.* 26:2H–18(b) and (c). The term "payor" has commonly been used in the health care industry to refer to anyone who pays for health care services, such as patients, commercial insurance companies (*i.e.,* Prudential), hospital service plans (*i.e.,* Blue Cross), and state and federally funded benefits programs (*i.e.,* Medicaid and Medicare).

Chapter 83 also created a Hospital Rate Setting Commission (HRSC), with power to approve the rates for all payors. *N.J.S.A.* 26:2H–4.1. More will be said later about the function of the HRSC.

In terms of payment, Chapter 83 employed the DRG method of reimbursement. *In re Schedule of Rates for Barnert Memorial Hosp., supra,* 92 *N.J.* at 36, 455 *A.*2d 469. That is, various medical procedures were divided into DRGs and a rate was assigned to each. *United Wire, Metal & Mach. Health and Welfare Fund v. Morristown Memorial Hosp.,* 995 *F.*2d 1179, 1189 (3d Cir.), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 382, 126 *L.Ed.*2d 332 (1993). Under the DRG system, instead of charging

payors the actual costs incurred for treating an individual patient, a hospital was required to charge the DRG rate which was designated for a particular classification for that hospital. *Ibid.* Regulations were promulgated to implement Chapter 83 and codified at *N.J.A.C.* 8:31B–1.1 *et seq.*

A URO is defined as "a group of physicians within a designated geographical area who review the health care provided to patients in area hospitals. Physicians may be assisted by other health care professionals." *N.J.A.C.* 8:31B–3.77. As we stated earlier, the regulations created a URO system as well as a system for reimbursements to hospitals under DRG. This dual system was established in *N.J.A.C.* 8:31B–3.76, which provides:

> (a) P.L.1978, *c.* 83 provides that reasonable payment may be made only for "appropriate and necessary health care services of high quality required by (each) hospital's mix of patients." In order to discharge this statutory obligation, two systems are required: The reimbursement system, payment by the case, establishes reasonable rates for patients who are correctly assigned to a Diagnosis Related Group (DRG). *A utilization review organization system is required to ensure that the hospital services which are provided are appropriate, necessary, and of high quality.*
>
> (b) This section sets forth *minimum qualification criteria for utilization review organizations, prescribes the qualification procedure, and establishes a method for financing organizations which qualify. The criteria are designed to delineate the respective roles of payment and review so as to capitalize on the strengths of each. In this way, the systems may complement one another to the greatest degree,* thereby promoting "effectiveness and efficiency of the health care system as a whole." (Emphasis added).

UROs are qualified by the DOH, *N.J.A.C.* 8:31B–3.80, and once that status is achieved, "the URO shall have access to only those hospital patient records for which [the particular URO] has direct review responsibility." *N.J.A.C.* 8:31B–3.76(c). But "[e]ach inpatient in each hospital selected by the Commissioner [of Health] pursuant to [Chapter 83], must be subject to review by a qualified utilization review organization concerning the necessity and appropriateness of inpatient admission and continuing stay." *N.J.A.C.* 8:31B–3.78(a). A State-qualified URO is generally independent from the hospital it reviews, except where it provides a form of delegated review in which the hospital performs certain review functions and the URO serves in a monitoring and oversight

capacity. *N.J.A.C.* 8:31B–3.80(a)(2). We have been informed that many delegated review plans have been approved by the DOH.

### B. After Chapter 160

The enactment of Chapter 160 meant that some of the statutory provisions of Chapter 83, which formed the basis for some of the regulations dealing with UROs, were either repealed or invalidated. General recognition of that fact prompted the inquiry of the DOH which resulted in the DOH's April 2, 1993, memorandum.

The April 2, 1993, memorandum was written by Assistant Commissioner of Health Pamela S. Dickson. It stated:

> The Health Care Reform Act of 1992 retains that longstanding statement that it is "... the public policy of the State that hospital ... services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health". *N.J.A.C.* 8:43G–4.1 et seq. implements this policy by mandating that every New Jersey hospital patient receive care and health services in an appropriate and informed manner without discrimination. *To ensure the necessity and appropriateness of high quality health care services to the citizens of New Jersey, particularly in light of other complex changes brought about by the Reform Act [Chapter 160], the Departments of Health and Insurance will be establishing a joint panel to review the issues of utilization review and quality assurance and to recommend a plan for the years beyond 1993. To maintain continuity, however, the state-certified Utilization Review Organizations (UROs) will continue utilization review functions in 1993.* (Emphasis added).

Dickson then enumerated the "[t]asks for the UROs in 1993" as follows:

- Review medical necessity of services.
- Adjudicate appeals arising out of 1992 discharges (appeals for patient bill, DRG assignment and medical necessity can be initiated for up to a year after issuance of the bill).
- Monitor hospital coding of the medical record.
- Monitor billing for accuracy and appropriateness of services.
- Monitor quality of medical care and access.
- Assist in assuring accuracy of the hospital patient-level data submitted to the Department of Health.

Thereafter, Dickson specifically recognized that Chapter 160 had eliminated the DRG system by stating:

> Monitoring of the accuracy of DRG assignment will no longer be required of the UROs in 1993 and excessive DRG rate appeals will not be available to patients

discharged subsequent to December 31, 1992. A *new task* [for UROs] for 1993 will be the monitoring of patient bills, to ensure that services billed were provided. As a result of these *revised tasks,* the Department will be asking the URO's to submit revised operational plans by May 31, 1993.
(Emphasis added).

Dickson also reminded the hospitals that

[t]he revenue cap established for each hospital in 1993 is based on 1992 rates which contain utilization review costs as a financial element. Therefore, hospitals should set their charges sufficient to collect this revenue from payers and transmit fees to UROs in the same manner as previously.

In April 1993, the DOH proposed new regulations to monitor adherence to Chapter 160's revenue cap for 1993. 25 *N.J.R.* 1660 (April 19, 1993). Those regulations were adopted in June 1993. 25 *N.J.R.* 3205 (July 19, 1993). Thereafter, the DOH proposed amendments and repeals to the regulations codified in *N.J.A.C.* 8:31B. Included in the rules proposed for repeal were all those which described the calculation and implementation of hospital rate schedules and those which defined the DRGs. 25 *N.J.R.* 3566 (August 2, 1993). Those regulations are *N.J.A.C.* 8:31B–3.2, .4–.7, .9, .10, .15, .18–.23, .27–.34, .37–.42, .44–.45, .51–.52, .55, .57, .63–.65, .71–.75 and .87; *N.J.A.C.* 8:31B–5; Appendices I, III, IV–VIII, and XI.

*II*

█ Appellants contend that Chapter 160's repeal of Chapter 83's prospective rate-setting methodology and DRG system of reimbursement also invalidated the legislative authority for many of the URO regulations, *N.J.A.C.* 8:31B–3.76 to –3.82, thereby abolishing the necessity for hospitals to give access to State-qualified UROs and pay them for utilization reviews. The DOH and the State-qualified UROs claim the regulations are valid and enforceable because Chapter 160 retained Chapter 83's policies of medical necessity and efficiency of services. We review the issues raised in these appeals within the limited context of the efficacy and payment of UROs during the 1993 transition year only. Our comparative analysis of Chapters 83 and 160 persuades us to conclude that a statutory basis for State-qualified UROs still exists

and that Chapter 160 simply eliminated some of the functions of State-qualified UROs.

It is undisputed that both Chapters 83 and 160 do not expressly permit or prohibit a URO system. *N.J.S.A.* 26:2H–5 granted the Commissioner of the DOH the power to promulgate and enforce rules to implement the policy dictates of Chapter 83; that authority was not changed by Chapter 160. State-qualified UROs were established "to ensure that the hospital services which are provided are appropriate, necessary, and of high quality." *N.J.A.C.* 8:31B–3.76(a). The statutory authority for *N.J.A.C.* 8:31B–3.76(a) is *N.J.S.A.* 26:2H–2k, designed to compel hospitals to provide "appropriate and necessary health care services of high quality."

■ Although Chapter 160 specifically repealed the rate-regulation aspect of health care, *see N.J.S.A.* 26:2H–18.51b, it in no way diminished the DOH's responsibility with respect to medical necessity and efficiency of services. Chapter 160 retained the longstanding language of *N.J.S.A.* 26:2H–1 that "hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health." Indeed, Chapter 160 reinforced that mandate in *N.J.S.A.* 26:2H–18.51a by reemphasizing the legislative intent for proper utilization, efficiency and medical necessity by stating: "It is of paramount public interest for the State to take all necessary and appropriate actions to ensure access to and the provision of high quality and cost-effective hospital care to its citizens."

■ Contrary to the contentions of appellants, the State-regulated UROs were established to render much broader services than those rendered in connection with the hospital rate-setting functions. They were designed to serve the dual roles of payment and review. This dual purpose implies an awareness of the fact that hospitals are subject to extensive regulation to protect the public's interest. *Desai v. St. Barnabas Medical Center,* 103 *N.J.* 79, 88–90, 510 *A.*2d 662 (1986). Clearly, the DOH has the power and obligation to inquire into and assess the appropriateness of

health care services and the authority to promulgate reasonable regulations relating to the quality of health care, including its authority to license a health care facility under *N.J.S.A.* 26:2H–12b. The reviews aided the DOH in this capacity.

Furthermore, we are satisfied that in view of the DOH's regulatory review and enforcement functions, its authority must be liberally construed because of its obligation to protect the health and welfare of the public. *New Jersey Ass'n of Health Care Facilities v. Finley*, 83 *N.J.* 67, 79, 415 *A.*2d 1147 (1980), *cert. denied, appeal dismissed*, 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980). In view of the foregoing, we hold that the DOH has the authority to use State-qualified UROs for the study and evaluation of medical necessity and efficiency. While the repeal of Chapter 83's regulated hospital reimbursement system means the URO findings are no longer binding on the payors or patients, the UROs continue to serve a vital function for the DOH. For the same reasons, we find that *N.J.A.C.* 8:31B–3.78(a)li–iv, which describe the non-reimbursement functions of State-qualified UROs, have not been repealed by Chapter 160. We are, however, compelled to conclude that the remainder of *N.J.A.C.* 8:31B–3.78 as well as *N.J.A.C.* 8:31B–3.79 were repealed by Chapter 160.[1] No challenge has been made respecting the qualification procedure for State-qualified UROs detailed in *N.J.A.C.* 8:31B–3.80.

Notwithstanding the fact that the URO functions were vital to the rate-setting process until December 31, 1992, the URO support system was always distinct from the reimbursement system. *N.J.A.C.* 8:31B–3.76a. This was based on *N.J.S.A.* 26:2H–2k, which was not changed by Chapter 160. Our review of Chapters 83 and 160 persuades us to conclude that the URO system is entirely severable from the rate-setting and reimbursement system, and that one system has not tainted the other. *Ampro Fisheries, Inc. v. Yaskin*, 247 *N.J.Super.* 111, 118–19, 588

---

[1] The enactment of *L.*1993, *c.* 63 has no impact beyond allowing patient appeals for the 1992 calendar year when Chapter 83 methodology was in effect.

A.2d 879 (App.Div.1991) (the provision of a regulation is entirely severable and "its illegality does not taint the validity of the remaining regulatory scheme"), *rev'd in part on other grounds*, 127 *N.J.* 602, 606 *A.*2d 1099 (1992), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 409, 121 *L.Ed.*2d 333 (1992). *See also Exxon Corp. v. Hunt,* 109 *N.J.* 110, 118, 534 *A.*2d 1 (1987) (quoting *Chamber of Commerce v. Hughey,* 774 *F.*2d 587, 597 (3d Cir.1985)) (severability of a statute " 'is largely a question of whether the statute will continue to make sense after the challenged portion is excised' "); *Gardens v. City of Passaic,* 130 *N.J.Super.* 369, 380, 327 *A.*2d 250 (Law Div.1974) (severability of an ordinance is whether, on balance, "the remainder of the regulations [are] functionally self-sufficient to contain the essentials of a complete enactment"), *aff'd sub nom. Iafelice v. City of Passaic,* 141 *N.J.Super.* 436, 358 *A.*2d 805 (App.Div.1976). We conclude, therefore, that the hospitals must allow access to patient records by State-regulated UROs to conduct 1993 reviews. The scope of the State-qualified URO reviews is limited to necessity and efficiency of services.

## *III*

■ Next, we address whether the hospitals are obligated to pay the State-qualified UROs for the 1993 transition year reviews. Appellants contend the payment for URO services under *N.J.A.C.* 8:31B–3.81 is now invalid since Chapter 160 repealed the rate-setting procedure and methodology of Chapter 83 which was utilized to pay for the URO services. The Attorney General argues that *N.J.A.C.* 8:31B–3.81 was not repealed by Chapter 160 because Chapter 160 revenue caps for the transition year included an amount corresponding to the costs of URO services.

■ Preliminarily, we must note that the Attorney General's position is inconsistent with that taken by the DOH in its April 2, 1993 memorandum. If the DOH did not believe *N.J.A.C.* 8:31B–3.81 had been invalidated by Chapter 160, why did it not simply rely on that regulation as the basis for payment to UROs for services? Instead, the DOH informed the hospitals that each

hospital's revenue cap for 1993 included the costs for URO services. But even if their positions are not inconsistent, we reject the contention that *N.J.A.C.* 8:31B–3.81 was not invalidated by Chapter 160.

Under *N.J.A.C.* 8:31B–3.81, which was effective through December 31, 1992, the DOH submitted to the HRSC reasonable annual adjustments to each Chapter 83 hospital's preliminary cost base (PCB), that portion of a hospital's reasonable expenses the DOH determines deserves to be covered by the hospital's charges to its patients. *N.J.S.A.* 26:2H–2k. The adjustment allowed by the HRSC was to cover the payment for URO services which became part of the rate schedule for each hospital. Each hospital was responsible for collecting from the payor, under the rate schedule, the added adjustment for URO services and pay that sum over to the URO. *N.J.A.C.* 8:31B–3.81.

Chapter 160 did not define PCB, but it referred to Chapter 83's definition in *N.J.S.A.* 26:2H–2k. *See N.J.S.A.* 26:2H–18.52. For the 1993 transition year, the HRSC was required to establish a revenue cap for each hospital whose rates had been established pursuant to Chapter 83. *N.J.S.A.* 26:2H–18.53a also set forth the methodology the DOH and the HRSC were to follow in setting the hospital caps for 1993. The revenue caps were to be based upon the same financial elements used to prepare the PCB for 1992, except for an included subsidy to Blue Cross and Blue Shield and for patient appeals.[2] If a hospital's revenue exceeded its 1993 cap, it was liable for a civil penalty. *N.J.S.A.* 26:2H–18.53c. *See N.J.A.C.* 8:31B–3.70, effective July 19, 1993, which outlines the methodology for determining each hospital's 1993 revenue and the penalty for exceeding the cap.

---

[2] When the Legislature recognized that it had eliminated patient appeals for bills incurred prior to December 31, 1992, it enacted *L.*1993, *c.* 63 on March 4, 1993, but made the enactment retroactive to February 22, 1992. This simply means that patient appeals were allowed for the time the DRG methodology and appeal process were in effect.

All of the UROs in these appeals and the DOH claim the 1992 URO costs were included in the 1993 revenue caps. Although they never explained specifically where in the methodology the costs were included, they infer that they were part of the 1992 PCB, that is, as a final adjustment similar to what had occurred under Chapter 83.

Because the 1993 revenue caps were calculated using a hospital's 1992 PCB, it seems reasonable to assume that the hospitals would have to set at least the same rates for services as supplied in 1992 to avoid the penalty which could be imposed under *N.J.S.A.* 26:2H–18.53c for exceeding its cap. That is precisely what the DOH stated in its April 2, 1993 memorandum. Thus, the 1993 rate charged should have been more than a collection target; rather, it should have included a payment for URO services. By charging the 1992 rates, the hospitals would have satisfied the requirements for the 1993 transition year while at the same time avoiding any penalties. Thus, we hold that the hospitals were not only obligated to permit the State-regulated UROs to conduct their reviews, but they were also obligated to collect from the payors, the cost of the URO services.

We appreciate the fact that some payors may resist payment of the cost of URO services since Chapter 160 repealed Chapter 83's power over the hospitals and payors with respect to reimbursement for medical services. But we have not been made aware of any attempt to join any of the major commercial payors to this litigation, and they have not moved to intervene. We were informed at oral argument, however, that Axiom has been conducting 1993 reviews at some of the hospitals, and those hospitals are sending Axiom the hospital's checks in payment. After weighing all the pros and cons, we conclude that the hospitals were obligated to collect from the payors and failure to do so transforms the hospital's liability from that of collecting agent to primary obligor if they unqualifiedly waived their collection obligation. Viewed in this context, there is no unconstitutional taking of a hospital's property.

 We also reject the contention that the method of paying for the URO services in 1993 represents rule making, see discussions which follow, in violation of the Administrative Procedures Act (APA), *N.J.S.A.* 52:14B–1 *et seq.* The April 2, 1993 memorandum was merely an interpretation of the valid regulations in light of the transition year caps. Beyond that, the payment system based on the 1992 rates is only for the transition year. *See generally In re Dept. of Ins. Orders,* 129 *N.J.* 365, 609 *A.*2d 1236 (1992).

## IV

The Hospital Association contends further that the Department's April 2, 1993 memorandum is invalid as it constituted a rule of general applicability which was not adopted in compliance with the APA. The DOH asserts that such compliance was unnecessary because the memorandum was merely a reflection of pre-existing legal requirements and was designed to provide the hospitals with clear instructions on the role of UROs under the new legislation. Additionally, Peer Review argues that the memorandum does not violate the APA, because it constituted the DOH's response to the Hospital Association's January 22, 1993 letter requesting the agency's position regarding the role of UROs in 1993 in light of Chapter 160.

 Not surprisingly, after an agency has adopted regulations, it is "confronted continually with requests for concrete interpretation or construction of its regulations and for advance views on whether certain proposed conduct or activity is permissible." *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138, 154, 183 *A.*2d 64 (1962). In responding to such requests, an agency may find it appropriate "to issue more detailed interpretations or applications of . . . [its] regulations for the future guidance of all persons who may be affected." *Ibid.* Therefore, an agency is not required to follow the rulemaking procedures of the APA every time it interprets its own regulations, but instead may utilize either hybrid proceedings possessing characteristics of both adjudication

and rulemaking, or informal rulemaking through procedures that are neither adjudicatory nor rulemaking.

 To be sure, administrative agencies possess extremely broad authority to determine whether to act through rulemaking, adjudication or informal procedures. *In re Request for Solid Waste Utility Customer Lists*, 106 *N.J.* 508, 518–21, 524 *A.*2d 386 (1987). *Accord Metromedia, Inc. v. Director, Div. of Taxation*, 97 *N.J.* 313, 333, 478 *A.*2d 742 (1984); *St. Barnabas Medical Ctr. v. New Jersey Hosp. Rate Setting Comm'n*, 250 *N.J.Super.* 132, 142, 593 *A.*2d 806 (App.Div.1991). However, this flexibility does not allow an agency to ignore the dictates of the APA. *St. Barnabas, supra*, 250 *N.J.Super.* at 142, 593 *A.*2d 806. But, "[w]hen the agency is concerned with 'broad policy issues' that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and prospective effect, rulemaking becomes the suitable mode of proceeding." *Crema v. New Jersey Dep't of Envtl. Protection*, 94 *N.J.* 286, 299, 463 *A.*2d 910 (1983). The APA defines a rule as an agency statement of "general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e).

 We turn now to the DOH's April 2, 1993 memorandum to determine whether it represents a mere interpretation of an existing, valid regulation or rule making. We find that it falls into both categories. Under the interpretation umbrella, the memorandum reiterated and listed those URO functions found in *N.J.A.C.* 8:31–B3.78(a) which were not invalidated by Chapter 160's repeal of Chapter 83's DRG methodology. To that extent, the memorandum represented the administrative agency's interpretation of how Chapter 160's elimination of the DRG methodology impacted the UROs.

 But the memorandum did more. It acknowledged that it was assigning "a new task" for UROs for 1993. That new task is

to monitor patient bills "to ensure that services billed were provided." The memorandum also acknowledged that the UROs had to submit revised "operational plans" for implementing the new task. This new task for UROs had not been expressed in any prior regulation or agency determination. Even though this new function is inferable from, and is in response to Chapter 160's elimination of the monitoring of the DRG classifications under Chapter 83, this represented a new rule under the APA and *Metromedia, supra,* 97 *N.J.* at 331–32, 478 *A.*2d 742.

We hold that the rulemaking aspect of the memorandum, although illegal, did not taint the interpretative aspect. *Ampro Fisheries, supra,* 247 *N.J.Super.* at 118–119, 588 *A.*2d 879. But the scope of State-qualified UROs during the 1993 transition year cannot be expanded by the memorandum. Therefore, the scope of State-qualified URO reviews for 1993 is limited to that contemplated by those subsections of *N.J.A.C.* 8:31B–3.78(a) which we have found to be valid. That scope does not include monitoring patient bills.

## V

The Hospital Association further contends the DOH's requirement for the use of State-qualified UROs for 1993 is arbitrary. It argues there are better and less expensive ways to conduct utilization review and quality assurance than through a state system of qualified UROs. It also asserts that many payors are refusing to accept the determinations of qualified UROs as binding and are, instead, performing their own utilization review functions. It claims many payors have determined that it is more cost effective for them to either perform utilization review activities using their own medical advisors, or contract with other UROs and pay them directly for such services.

The Hospital Association further claims that hospitals are required to conduct their own utilization review activities as a condition of continuing accreditation.

██ Where, as here, the Legislature entrusts an agency with the responsibility of "selecting the means of achieving an articulated statutory policy, the relation or nexus between the remedy and the goal sought to be accomplished is peculiarly a matter for administrative competence." *In re NJPDES Permit No. NJ 0055247*, 216 *N.J.Super.* 1, 11, 522 *A.*2d 1002 (App.Div.), *certif. denied*, 108 *N.J.* 185, 527 *A.*2d 1390 (1987). Indeed, it is "a basic tenet of judicial review that the courts are not free to substitute their judgment for that of the administrative agency charged with the responsibility of executing a policy enunciated by the Legislature." *Ibid.* (citations omitted). This is especially true in the area of health care. *In re 1976 Hosp. Reimbursement Rate for Kessler Memorial Hosp.*, 78 *N.J.* 564, 578, 397 *A.*2d 656 (1979) (Handler, J., concurring).

We reject the contentions that the agency acted arbitrarily. The DOH had wide latitude in deciding which URO to utilize. The State-qualified URO review system is free from the vested economic interests of individual payors which we believe to be in the public's best interest. Even though neither hospitals nor payors are bound by a State-qualified URO's determination, the DOH can use the information from that URO in conjunction with its licensing powers and to prevent abuses in the provision of medical services or health care costs. *See New Jersey Ass'n of Health Care Facilities v. Finley*, 168 *N.J.Super.* 152, 162–63, 402 *A.*2d 246 (App.Div.1979), aff'd, 83 *N.J.* 67, 415 *A.*2d 1147 (1980). In addition, payors using their own utilization reviews are only concerned with patients covered under their own payment systems. Thus, there could be hospital patients who might not receive any review, especially if the treating hospital or the third-party payor did not provide that evaluation.

Finally, even though Chapter 160 deregulated the hospital rate-setting system and eliminated the DRG methodology in favor of the demands of a competitive market, that act did not abandon the State's policy of promoting "cost-effective hospital care to its citizens." *N.J.S.A.* 26:2H–18.51a. Indeed, one of the duties of the

New Jersey Health Services Commission established by Chapter 160, *N.J.S.A.* 26:2H–55a, is to "[r]eview the level of hospital charges and assess their appropriateness in relation to hospitals in neighboring states." *N.J.S.A.* 26:2H–18.55g. In the face of these compelling reasons, and the fact that the hospital business has become competitive, the DOH did not act arbitrarily or unreasonably in deciding to use State-qualified UROs for the limited scope of review during the 1993 transition year.

As we have stated above, our decision affirming the decision of the DOH to use State-qualified UROs and requiring hospitals to pay for their services is limited to the 1993 transition year. We hold that effective January 1, 1994, the DOH must reevaluate its URO system and promulgate new regulations in accordance with the APA and *Metromedia* in light of Chapter 160. The DOH acknowledged the need for new regulations in its April 2, 1993 memorandum when it stated that the Departments of Health and Insurance had to determine the use of UROs "for the years beyond 1993."

We affirm under A–4132–92T3 the DOH's interpretation that State-qualified UROs are to be used to conduct limited reviews during the 1993 transition year only. We also affirm the two Chancery Division orders entered in A–342–93T3 and A–778–93T3F. The stay of the payment provision of the order involved in A–342–93T3 is vacated.